**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| WILLIAM LARRY PAYNE and | ) | Case No. 05-13435 |
| TERRI WILSON PAYNE, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| CHARLES M. IVEY, III, Trustee for | ) | Adversary Proceeding |
| William Larry Payne and Terri Wilson | ) | No. 05-2118 |
| Payne | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MELVIN WESLEY WILSON and | ) | |
| DONNA HUNT WILSON, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**<u>MEMORANDUM OPINION</u>**

This adversary proceeding came on for trial on October 10, 2006, to determine whether to avoid a claim of lien. Aleta B. Kiser appeared on behalf of Melvin Wesley Wilson ("Mr. Wilson") and Donna Hunt Wilson ("Mrs. Wilson") (collectively the "Wilsons"), and John M. Blust appeared on behalf of Charles M. Ivey, III, the duly-appointed Chapter 7 trustee (the "Trustee").

The amended complaint of the Trustee challenges the Wilsons' claim of a lien on a 2005 Saturn Relay and alleges that the grant of the lien was a preferential transfer pursuant to Section 547(b) of the Bankruptcy Code. Alternatively, the complaint alleges that the transfer of a one-

1

half interest in the vehicle to Mrs. Wilson was a fraudulent conveyance pursuant to Section 548

of the Bankruptcy Code.  The lien was based on a note and security agreement executed in favor

of Mrs. Wilson by her daughter, Terri Wilson Payne ("Mrs. Payne"), one of the above-referenced

debtors.  The Wilsons assert that Mrs. Wilson is a co-owner of the vehicle and that the

transaction between Mrs. Wilson and Mrs. Payne is an installment sales contract.

Based upon a review of the evidence presented at trial, the arguments of counsel, and a

review of the entire official file, this Court finds that Mrs. Payne owns the Vehicle, Mrs. Wilson

has an unsecured claim, and, in the alternative, the transaction between Mrs. Wilson and Mrs.

Payne constitutes a fraudulent conveyance.

## I. FACTS

The Wilsons are the parents of the female debtor, Mrs. Payne.  On January 10, 2005,[1] the

Wilsons and Mrs. Payne stopped at a car dealership, Saturn of Greensboro, to look at new

vehicles.  The Wilsons knew that their daughter needed a vehicle and that she had no means with

which to purchase one.  The Wilsons and Mrs. Payne selected a 2005 Saturn Relay (the

"Vehicle") to purchase.[2]    That day Mrs. Wilson agreed to pay the entire purchase price of the

Vehicle.  Mrs. Wilson initially intended to own the Vehicle and wanted her name on the title

because, in her words, she paid for the Vehicle.  However, the dealer told Mrs. Wilson that Mrs.

Payne had to be a co-owner if Mrs. Payne was to pay for the requisite collision and liability

---

[1]The parties stipulated that, as of this date and thereafter, the Paynes were insolvent.

[2]Mrs. Wilson testified that all three of them stopped at the dealership to look at cars.  Mrs. Payne testified that her parents picked out the Vehicle, not her.  Mrs. Wilson testified that she talked her daughter into buying a new car but that she (Mrs. Wilson) thought, based on past experience, that she (Mrs. Wilson) would eventually be driving it once the Paynes got "back on their feet."

insurance on the Vehicle.  It was agreed that Mrs. Wilson and Mrs. Payne would be co-owners.[3]

That same day, Mrs. Payne took possession of the Vehicle and drove it from the dealership.  No

credit application was ever made or contemplated by Mrs. Payne.  There was no discussion of

Mrs. Payne paying for the Vehicle.

On January 11, 2005, Mrs. Wilson delivered a check to the dealer in the amount of

$24,021.86 for the full purchase price of the Vehicle.

Within the next two days, the Wilsons and Mrs. Payne began to rethink the situation.  The

Wilsons had a long history of supporting their daughter and son-in-law financially.  The Wilsons

loaned money to the Paynes on several occasions, but the loans were usually not repaid.[4]  In

addition, the Wilsons purchased a home for the Paynes to live in, and the Paynes pay them rent.

Mrs. Payne testified that she and her husband were having marital problems and that she wanted

to protect her mother if the Paynes later divorced.   Mrs. Wilson testified that Mrs. Payne wanted

to protect Mrs. Wilson "if something happened" to Mrs. Payne.

The Wilsons and Mrs. Payne presented conflicting evidence concerning who originated

---

[3] The Title Application, dated January 10, 2005, shows that owners of the Vehicle are Mrs. Payne and Mrs. Wilson, who both signed.  The Vehicle Order, dated January 10, 2005, shows Mrs. Payne and Mrs. Wilson are "co-buyers."  The Certificate of Title for the Vehicle was issued on January 28, 2005, showing the two women as co-owners and showing no lienholder. The Certificate of Title was mailed by the North Carolina Division of Motor Vehicles (the "DMV") to Mrs. Payne, who gave it to Mrs. Wilson because, she testified, "it was my car."

[4] In one instance, the Wilsons had purchased a van for the Paynes, and the van was titled in Mr. Payne's name.  No payments were made by the Paynes.  Eventually the van was given by Mr. Payne to someone else.  Mrs. Wilson testified that she and her husband did not approve but had "no control" over the situation.

3

the idea,[5] but eventually the Wilsons and Mrs. Payne agreed that Mrs. Payne would buy the

Vehicle from Mrs. Wilson.[6]  Mrs. Wilson and Mrs. Payne agreed that she could afford to pay

$350 per month for the Vehicle.  Although the Wilsons and the Paynes had not put any of their

previous agreements in writing, they decided that written evidence of this agreement was

appropriate.  The record is inconsistent concerning the preparation of the documents that would

formalize their agreement.[7]  Nonetheless, on January 13, 2005, Mrs. Payne executed a

Promissory Note and a Security Agreement in favor of Mrs. Wilson.

The Promissory Note, dated January 13, 2005, obligated Mrs. Payne to pay her mother the

principal amount of $24,022.00, just 14 cents more than Mrs. Wilson had paid for the Vehicle

---

[5]Mrs. Payne testified that it was her idea to pay for the Vehicle.  However, Mrs. Wilson's
affidavit indicated that it was the Wilsons who decided that Mrs. Payne needed to pay for the
Vehicle.

[6]Evidence was presented to the effect that Mrs. Wilson intended to retain ownership of
the Vehicle.  For instance, Mrs. Wilson's affidavit indicated that she worried that, "if something
happened to our daughter, then without any paperwork, no one would know that the Vehicle
belonged to me."  Mrs. Payne's affidavit states: "A couple of days later, my mother called me
and said that she and my dad had been talking and they were worried that something might
happen to me and they would be unable to prove that the car was really hers.  She said that we
needed to get something in writing."  The Court finds such statements self-serving and
unconvincing and notes that they are wholly contradicted by the relevant documents, by their
own statements, and by statements of their representatives.

[7]There is some evidence that Mrs. Wilson drafted the Promissory Note and Security
Agreement.  Mrs. Wilson's affidavit states: "I searched the internet and found the forms entitled
`Note' and `Security Agreement' on a website.  I copied the forms and my daughter and I signed
them."  Mrs. Payne's affidavit states: "I went over to my parents' home, and my mother had
some paperwork that she said that she had gotten off of the computer.  We went to my mother's
place of employment, I signed it and we had it notarized."  However, at trial the testimony
differed.  Mrs. Wilson testified that she and Mrs. Payne found sample documents on the internet
and that they completed them together.  Mrs. Wilson also testified that the documents were
signed at her house.  Mrs. Payne testified that she looked on-line for sample documents.  At trial,
neither Mrs. Wilson nor Mrs. Payne could remember who prepared the documents.

4

just two days before. The Promissory Note was made payable in 68 monthly payments of
$350.00 each, with the final payment due on November 20, 2010.[8]  The Promissory Note
specifically recites that it is "[f]or the purchase of 2005 Saturn Relay."

The Security Agreement, also dated January 13, 2005, granted Mrs. Wilson a security
interest in a "2005 Saturn Relay."  No specific Saturn Relay was identified in the Security
Agreement.  It recites that Mrs. Payne "owns the collateral free and clear of any interest."[9]  The
security interest in favor of Mrs. Wilson was never perfected.

Mrs. Payne made seven payments of $350.00 to Mrs. Wilson, then defaulted.[10]
Significantly, both Mrs. Wilson and Mrs. Payne testified that if all payments on the Vehicle had
been made, then Mrs. Wilson would sign her half ownership over to Mrs. Payne.

The Paynes first thought about filing for bankruptcy in September of 2005.  First Mr.
Payne met with a bankruptcy attorney[11] and then he met with a paralegal, who assisted in the
completion of the Paynes' bankruptcy schedules.  Two to three weeks later, the Paynes met with
their attorney and signed the petition and schedules.  Sometime between these two meetings, the
Paynes decided to file bankruptcy.

---

[8]At trial, Mrs. Wilson testified that she could not explain the substance of the Promissory
Note, which is somewhat odd considering her job.  See Mrs. Wilson's Affidavit, dated
August 11, 2006, page 2 (she "still work[s] twenty-three hours per week as a teller at a bank.").

[9]At trial, after reviewing the portion of the Security Agreement that recites that she owns
the Vehicle, Mrs. Payne testified that she signed it without reading it.  Later, Mrs. Payne testified
that she might have prepared the Security Agreement but that she did not know what was in it.

[10]Mrs. Payne testified that she did not intend to pay the full price of the Vehicle; she was
just paying the monthly payment while she was using the Vehicle.

[11]The Paynes' bankruptcy attorney of record is David H. Idol.

5

When the Paynes met with their attorney, they discussed the status of the Vehicle and were informed that they would likely lose the Vehicle to the bankruptcy trustee.[12]  On September 15, 2005, the Wilsons and Mrs. Payne went to a DMV office for the purpose of executing a title application that showed that Mrs. Wilson had a lien on the Vehicle.  DMV personnel told Mrs. Wilson that she could not be both a lienholder on the Vehicle and an owner of the Vehicle, so it was decided that Mr. Wilson would be the lienholder.  That day Mrs. Wilson and Mrs. Payne executed a Lien Recording Application and filed it with the DMV.  The Application shows that Mr. Wilson has lien on the Vehicle.[13]

On October 5, 2005, the Paynes filed their Chapter 7 bankruptcy.  Schedule  B lists Mrs. Payne as the owner of the Vehicle.[14]  Schedule D lists Mr. Wilson as a lienholder on the Vehicle.  Schedule G lists no executory contracts.  The Statement of Intent indicated that Mrs. Payne intended to keep the Vehicle.  Finally, the Paynes exempted the Vehicle.

As part of his normal investigation, the Trustee asked the Paynes and the Wilsons about

---

[12]"After my daughter and her husband consulted an attorney about filing bankruptcy, they understood him to say that they would lose the Vehicle, but that it could be protected if there was a lien on the vehicle.  My daughter and I signed a paper that we got from the DMV.  The DMV listed my husband as the lien holder."  Mrs. Wilson's Affidavit, August 11, 2006, page 2.

[13]On October 12, 2005, the DMV reissued a Certificate of Title for the Vehicle.  The Title lists Mrs. Wilson and Mrs. Payne as the owners and Mr. Wilson as the lienholder, with September 15, 2005 as the date of the lien.

[14]Mrs. Payne testified at trail that she reviewed and signed the schedules and that she and Mr. Payne reaffirmed the accuracy of the schedules at their Section 341 meeting.  However, Mrs. Payne also testified that (a) she was not aware that schedules listed the Vehicle as being owned by her alone, (b) the Vehicle had to be listed as hers because her name was on the title, and (c) she did not understand the column on Schedule B that indicated ownership.  Such testimony is akin to the story of the man who borrowed a pot from his neighbor.  When he returned the pot, it was cracked, and the neighbor sued.  In his answer, the man stated that he never borrowed the pot, it was never cracked, and it was cracked when he borrowed it.

the Vehicle.  Mrs. Wilson did not assert an ownership interest in the Vehicle.  In response to his request, Mrs. Wilson gave the Trustee two documents, one of which was titled "Loan Calculator Results."  This document, created by Mrs. Wilson, shows the payoff of a loan to Mrs. Payne and includes the monthly payment, the interest rate, the term of the loan, the total number of payments, and the total interest to be paid on the loan.  The document reads: "Your $24,022 loan has a payment is $349.27 per month for 82 months."[15]

Mrs. Wilson also gave the Trustee another document, dated October 31, 2005, that states, in its entirety: "The payoff on the auto loan for a 2005 Saturn Relay, dated January 13, 2005, between Terri Payne and Donna Wilson is $23,038.75 as of 10/31/2005.  This amount includes all late payments, fees and interest."  Mrs. Wilson also prepared this document.

On November 7, 2005, the Trustee filed a motion requesting turnover of the Vehicle.  On November 21, 2005, the Paynes filed an objection to the Trustee's motion, claiming that Mrs. Payne owned the Vehicle and that the Vehicle was exempt.  Mrs. Payne testified that she read and approved the objection before it was filed.

On December 30, 2005, the Wilsons answered the Trustee's complaint.  In their answer, the Wilsons alleged, for the first time, that Mrs. Wilson was a co-owner of the Vehicle.  The Wilsons also agreed that the Trustee was entitled to avoid any lien claimed by the Wilsons.

On March 13, 2006, the Trustee amended his complaint to add a cause of action for fraudulent conveyance.  On June 1, 2006, the Wilsons answered, asserting that Mrs. Wilson was the sole owner of the Vehicle and that the arrangement between Mrs. Payne and Mrs. Wilson was intended to be an installment sales contract whereby Mrs. Wilson retained title to the Vehicle.

_____

[15]Mrs. Wilson testified that her computer printed the word "loan" automatically.

## II. <u>DISCUSSION</u>

### A.  <u>Parol Evidence Is Not Admissible to Vary or Contradict the Security Documents</u>

Where contracting parties have reduced their agreement to a writing, if that writing, as a whole, is plain and unambiguous, evidence of prior or contemporaneous negotiations or agreements are inadmissible to vary or contradict the writing.  <u>Yarn Indus., Inc. v. Krupp Int'l, Inc.</u>, 736 F.2d 125, 129 (4th Cir. 1984); <u>see also</u> <u>C.F. Trust, Inc. v. Tyler</u>, 318 B.R. 795, 805 (Bankr. E.D. Va. 2004).  The Parol Evidence Rule, as enacted in North Carolina, is found within N.C. Gen. Stat. § 25-2-202, as follows:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented (a) by course of dealing or usage of trade (G.S. 25-1-205) or by course of performance (G.S. 25-2-208); and (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

The Promissory Note, the Security Agreement, the Paynes' bankruptcy schedules, Mrs. Payne's post-petition assertions, Mrs. Wilson's post-petition assertions, and the documents submitted by Mrs. Wilson to the Trustee all support a finding that Mrs. Payne owns the Vehicle. The only thing arguably inconsistent with this view is the failure of Mrs. Wilson, at the time of the sale, to request another title for the Vehicle showing Mrs. Payne's ownership and Mrs. Wilson's lien.  A plain reading of the Promissory Note, the Security Agreement, and the other documents shows that Mrs. Payne bought the Vehicle from Mrs. Wilson, who reserved a security interest in the Vehicle.  Parol evidence is not admissible to vary or contradict the Security Agreement and Promissory Note.  Even if parol evidence were admissible, the testimony of both

Mrs. Payne and Mrs. Wilson to the contrary was not convincing.  Mrs. Wilson bought the

Vehicle, sold the Vehicle to Mrs. Payne for the full price, and attempted to obtain a lien on the

Vehicle.

## B.  Mrs. Wilson Reserved Only a Security Interest in the Vehicle

The Trustee argues that the Uniform Commercial Code, not the Motor Vehicle Act,

controls the outcome of this case.  The Wilsons argue that the Motor Vehicle Act controls and

that Mrs. Wilson owns one-half of the Vehicle as evidenced by the certificate of title.

Both the Uniform Commercial Code (N.C. Gen. Stat. § 25-2-401) and the North Carolina

Motor Vehicle Act (N.C. Gen. Stat. § 20-38) deal with the transfer of ownership of motor

vehicles.  In Re Rountree Motorcars, Inc., 00-12683, slip op. at 5 (Bankr. M.D.N.C. April 30,

2001)(2001 WL 1699647).  Which of these statutory provisions applies in this case "depends

upon the nature of the transaction and the purpose for which the determination of ownership is

being made."  Id.

The Motor Vehicle Act controls in situations involving tort law and liability insurance

coverage.  Id. at 5; see also Nationwide Mut. Ins. Co. v. Hayes, 174 S.E.2d 511, 524 (N.C. 1970).

The Uniform Commercial Code is controlling in transactions involving the sale and financing of

motor vehicles.  Rountree, 00-12683, slip op. at 5; see also American Clipper Corp. v. Howerton,

316 S.E.2d 186, 192 (N.C. 1984).   The transaction in this case involves the rights and interests

of the parties directly involved in the sale and financing of the Vehicle and, therefore, the

Uniform Commercial Code controls.[16]

---

[16] The Wilsons attempt to distinguish three cases that apply the Uniform Commercial
Code to the sale of motor vehicles.  See Nationwide Mut. Ins. Co. v. Hayes, 174 S.E.2d at 524;
N.C. Nat'l Bank v. Robinson, 336 S.E.2d 666, 671 (N.C. App. 1985)(holding that the "U.C.C.

Article 2 of the Uniform Commercial Code was enacted in North Carolina as N.C. Gen. Stat. §§ 25-2-101, et. seq.; it covers transactions involving the sale of goods.  See N.C. Gen. Stat. § 25-2-102 (providing that "[u]nless the context otherwise requires, this article applies to transactions in goods") and N.C. Gen. Stat. § 25-2-105(1) (defining "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which price is to be paid, investment securities (Article 8) and things in action").  The term "goods" includes automobiles.  Rountree, 00-12683, slip op. at 7 n.4.

N.C. Gen. Stat. § 25-2-401 concerns the passing of title to goods and the reservation of security interests.  N.C. Gen. Stat. § 25-2-401(1) states, in part: "Any retention or reservation by the seller of the title (property) and goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest."  N.C. Gen. Stat. § 25-2-401(2) states, in part: "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller contemplates his performance with reference to the physical delivery of the goods, despite any reservation of a security interest or even though a document of title is to be delivered at a different time or place."  A "seller" means "a person who sells or contracts to sell goods."  N.C. Gen. Stat. § 25-2-103(d).  In this case, Mrs. Wilson is the seller, and Mrs. Payne is  the buyer.

---

should control over the MVA when automobiles are used as collateral and are held in inventory for sale"); American Clipper Corp. v. Howerton, 316 S.E. 2d at 192 (applying the Uniform Commercial Code to a consignment and stating that Hayes did not decide whether the Motor Vehicle Act, rather than the Uniform Commercial Code, would control in all circumstances). The Wilsons argue that these cases all involve merchants who sold vehicles to buyers in the ordinary course and that, here, Mrs. Wilson is not a merchant or a dealer and Mrs. Payne is not a buyer in the ordinary course.  The Court is not persuaded by this argument.  The applicable provisions of the Uniform Commercial Code make no such distinction, see N.C. Gen. Stat. § 25-2-103(d), and the Wilsons have cited no authority that supports their argument.

Although no North Carolina decisions are on point, courts in other states have addressed the attempt of a seller to retain title to goods sold.  In <u>Johnson v. Imported Cars of Maryland, Inc.</u> <u>(In re Johnson</u>), 230 B.R. 466, 468 (Bankr. D.D.C. 1999), the debtor purchased a vehicle from an automobile dealer and the dealer "spot delivered" the vehicle to the debtor.  <u>Id</u>. at 467.  The dealer and the debtor executed an Installment Contract, Spot Delivery/Financing, and a Buyer's Order.  <u>Id</u>.  The agreement provided that the debtor took possession of the car pending approval by a financing source.  <u>Id</u>.  The debtor filed a Chapter 7 bankruptcy before obtaining third party financing for the car.  <u>Id</u>.  No certificate of title was issued on the vehicle.  After the bankruptcy was filed, the dealer repossessed the automobile.  <u>Id</u>. at 468.  The dealer argued that it retained title due to the spot delivery terms.  <u>Id</u>.  The Chapter 7 trustee brought an action against the dealer for violation of the automatic stay.  <u>Id</u>.  The Bankruptcy Court relied on Maryland law (Md. Code Ann., § 2-401(1)) and held that "[e]ven if . . . [the dealer] had retained or reserved title, it would still only have a security interest. The passage of title cannot occur before goods are identified to the contract, nor can the passage of title be delayed until after shipment or delivery of the goods to the buyer. After shipment or delivery, any retention of title by the seller results only in the reservation of a security interest."  <u>Id</u>. at 468 (citations omitted).  N.C. Gen. Stat. § 25-2-401 is identical to the Maryland statute applied by the <u>Johnson</u> court.

In <u>In re U.I.P. Engineered Prods. Corp.</u>, 43 B.R. 480, 481 (Bankr. N.D. Ill. 1984), the court considered the issue of whether an attempted title-retention contract created a security interest under the Uniform Commercial Code.  The debtor settled a previously disputed claim of U.I.P. by agreeing to buy certain cranes from U.I.P. and pay monthly installments totaling $76,500.00.  <u>Id</u>.  The agreement stated that U.I.P. would retain title to the cranes until the debtor

11

completely satisfied its obligation under the agreement.  Id.  The debtor paid almost $40,000.00 under the agreement and defaulted before filing for bankruptcy.  Id.  U.I.P. never filed a financing statement regarding the cranes or took steps to perfect a security interest.  Id.  The court found that the attempted retention of title by U.I.P. created only a security interest in the cranes, and, because U.I.P. never properly perfected its security interest, U.I.P. held an unperfected security interest subordinate to a hypothetical lien creditor.  Id. at 482.  See also Joyner v. Nissan (In re Joyner), 326 B.R. 334, 341 (Bankr. D.S.C. 2004)(relying on Johnson and holding that a title retention agreement between a debtor and an automobile dealer, who "spot delivered" a vehicle to the debtor, was more accurately described as a retention of a security interest); In re Boles, 03-53196, slip op. at 5 (Bankr. M.D.N.C. Oct. 29, 2004)(2004 WL 3510119)(even if there was an agreement that title would not pass until the purchase price was paid, once the seller delivered the goods, title passed to the buyer and the most the seller could claim would be a security interest in the goods).

Pursuant to N.C. Gen. Stat. § 25-2-401, title to the Vehicle passed to Mrs. Payne, and all that Mrs. Wilson could reserve is a security interest in the Vehicle.  It is irrelevant whether Mrs. Wilson's name appears on the certificate of title to the Vehicle.  Any attempted reservation of title by Mrs. Wilson in the Vehicle is limited to a reservation of a security interest.

Article 9 of the Uniform Commercial Code regulates security interests in personal property and proscribes the rights of the parties.  Regarding the perfection of a security interest in a motor vehicle, North Carolina law provides: "The local law of the jurisdiction under whose certificate of title the goods are covered governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in goods covered by a certificate of title from

the time the goods become covered by the certificate of title until the goods cease to be covered by the certificate of title." N.C. Gen. Stat. § 25-9-303(c). The filing requirements of the Uniform Commercial Code do not apply to security interests in motor vehicles that are subject to a North Carolina certificate of title. See N.C. Gen. Stat. §§ 20-50, 20-52, and 20-58.[17] Instead, North Carolina Law provides that a security interest in a vehicle is perfected by entering a lien on the certificate of title. N.C. Gen. Stat. § 20-58. The party seeking to perfect a lien must submit an application for a certificate of title to the DMV. N.C. Gen. Stat. §§ 20-52(a) and 20-58(a).

The Certificate of Title lists Mrs. Wilson and Mrs. Payne as co-owners of the Vehicle and Mr. Wilson as a lienholder. Mrs. Wilson's security interest, as reflected in the Security Agreement, is invalid against the Trustee because Mrs. Wilson failed to properly perfect the interest pursuant to N.C. Gen. Stat. § 20-58(a). In addition, Mr. Wilson does not have a properly perfected security interest in the Vehicle because no corresponding security agreement was executed by Mrs. Payne. Therefore, Mrs. Wilson is an unsecured creditor of Mrs. Payne for the amount remaining due on the loan.

## C.  First Cause of Action: Lien Avoidance

The Trustee contends that Section 544(a) of the Bankruptcy Code gives the Trustee a judicial lien superior to the claim of lien of the Wilsons and allows the Trustee to avoid the Wilson's claim of lien. Section 544(a) of the Bankruptcy Code allows a Trustee to avoid a lien of a creditor that extends credit to a debtor at the time of the filing.

---

[17] Certificate of title statutes only govern the issue of whether or not the security interest in the collateral in question has been duly perfected. All other aspects of such transactions are governed by the Article 9 of the Uniform Commercial Code. Brockbank v. Best Capital Corp., 534 S.E. 2d 688, 692 (S.C. 2000).

In their answer, the Wilsons admit that the Trustee is entitled to avoid any lien claimed by the Wilsons on the Vehicle.  Moreover, neither Mrs. Wilson nor Mr. Wilson has a perfected lien on the Vehicle.  The Security Agreement insufficiently describes the collateral as a "2005 Saturn Relay."  Mrs. Wilson's lien was not noted on the Certificate of Title to the Vehicle.  <u>See</u> N.C. Gen. Stat. § 20-58.  Even though Mr. Wilson is noted as the lienholder on the Certificate of Title, he does not have a security interest in the Vehicle because there is no security agreement evidencing such an arrangement.  The Trustee has a lien on the Vehicle that is superior to any claim of lien of the Wilsons.

## D. Second Cause of Action: Preferential Transfer

The Trustee contends that the claim of lien by Mr. Wilson is an avoidable preferential transfer pursuant to Section 547(b) of the Bankruptcy Code, which provides that a Trustee may avoid any transfer of an interest of the debtor to or for the benefit of a creditor while the debtor was insolvent and made within one year before the filing of the petition, if such creditor was an insider.

The Wilsons admit in their amended answer that the transfer to Mr. Wilson may be avoided by the Trustee as a preferential transfer and that Mr. Wilson had no lien on the Vehicle. Mr. Wilson did not have a lien on the Vehicle.  If Mr. Wilson had a perfected security interest in the Vehicle, the grant of the lien would have been a preference.  Since no security interest was perfected by the Wilsons, no preferential transfer occurred.

## E. Third Cause of Action: Fraudulent Transfer

Alternatively, if Mrs. Wilson had an ownership interest in the Vehicle, it would constitute a fraudulent conveyance.  For the Trustee to avoid the transfer of a one half ownership interest in

14

the Vehicle as a fraudulent conveyance pursuant to Section 548(a) of the Bankruptcy Code, there must have been a transfer of an interest in property by Mrs. Payne within one year[18] prior to her bankruptcy whereby Mrs. Payne received less than a reasonably equivalent value in exchange for such transfer.  The transaction meets these requirements.  Mrs. Wilson secured the Promissory Note from Mrs. Payne for the full purchase price of the Vehicle, and Mrs. Payne signed the Security Agreement in favor of Mrs. Wilson.  The Promissory Note and the Security Agreement obligated Mrs. Payne to pay the full purchase price of the Vehicle. Through this transaction, Mrs. Wilson obtained a one half interest in the Vehicle for no consideration.  The transaction occurred within one year of the filing of the Paynes' Chapter 7 bankruptcy,[19] at a time when the Paynes were insolvent.  Thus, if the Court were to find that Mrs. Wilson retained a one-half interest in the Vehicle, the retention of that one-half interest would constitute a fraudulent conveyance and should be avoided.

### III.  CONCLUSION

Section 544(a) of the Bankruptcy Code gives the Trustee a judicial lien superior to the claim of lien of the Wilsons and allows the Trustee to avoid the Wilsons' claim of lien.  Neither of the Wilsons ever perfected a security interest in the Vehicle.  Finally, if Mrs. Wilson had retained a one-half interest in the Vehicle after Mrs. Payne agreed to pay the full purchase, this would have constituted a fraudulent conveyance.

---

[18]The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 increased the "look back" period for fraudulent conveyances to two years, but the general effective date of the Act is October 17, 2005, so the applicable "look back" period in this case is one year.

[19]Mrs. Payne signed the Security Agreement and Promissory Note on January 13, 2005, and the Paynes filed their bankruptcy on October 5, 2005.

This Court will enter a separate Order avoiding any claim of lien by the Wilsons on the Vehicle, allowing the Trustee to recover the Vehicle pursuant to Section 550 of the Bankruptcy Code, and preserving the claim of lien for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.